UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL T. OWENS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:21-cv-02241-JPH-KMB ) |
| NEIL D. PROPST Dr., TERRANCE DICKERSON Warden, WILLIAMS Chief, | ) ) ) ) |
| Defendants. | ) ) |
| CITY OF INDIANAPOLIS, | ) ) ) |
| Interested Party. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Michael Owens alleges that he was denied medical care related to a COVID-19 infection and held in a dirty cell at the Marion County Jail in 2020. Defendants have filed a motion for summary judgment. Dkt. [95]. For the reasons below, that motion is **GRANTED**.

I.
**Facts and Background**

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

In early April 2020, while Mr. Owens was a pretrial detainee at Marion County Jail, he and a few other detainees tested positive for COVID-19. Dkt.

1

96-1 at 3; *see* dkt. 26 at 2–3; dkt. 111 at 4.  Around this time, Dr. Neil Propst, the jail's medical director, had been involved in developing the jail's COVID-19 response plan under CDC Guidelines.  Dkt. 96-1 at 1, 3-4.  As part of this plan, detainees who tested positive for COVID-19 were quarantined together as a group—a policy known as "cohorting"—which the CDC recommended for environments like the jail where individual isolation was not practical.  *Id.*; dkt. 96-2.  Under this policy, Mr. Owens was relocated to the 2-F housing unit to quarantine on April 5.  Dkt. 96-1 at 4.

While in 2-F, Mr. Owens was offered medical visits at least once daily by Dr. Propst or other medical staff.  *Id.*; dkt. 96-3.  During these visits, staff checked Mr. Owens's vitals and oxygen levels and performed respiratory assessments.  *See* dkt. 96-3.  Dr. Propst also ordered an x-ray in April 2020 and an EKG in May 2020.  Dkt. 96-1 at 5, 8; dkt. 96-3 at 13, 22.  At that point in the pandemic, medical-grade masks were in extremely short supply, but Marion County staff including Dr. Propst continually tried to obtain masks for patients in the jail.  Dkt. 96-1 at 6.

On April 22, Dr. Propst noted that Mr. Owens was asymptomatic, and that if he remained symptom-free for 72 hours, he could be released from quarantine.  Dkt. 96-1 at 6; dkt. 96-2 at 17 (CDC guidance on patient isolation).  However, Mr. Owens then reported shortness of breath, meaning he was no longer asymptomatic or eligible to leave quarantine.  *Id.*

By early May, there were too many COVID-positive patients to fit in the 2-F dorm unit.  Dkt. 96-1 at 7.  Jail officials moved the patients who had been

2

in quarantine the longest to two-person cells in the 4-South unit. *Id.* Mr. Owens was among the patients reassigned from 2-F to 4-South. *Id.* During this transfer, Chief Williams had officers escort Mr. Owens and others to the 4-South cells after they complained about conditions in the jail. Dkt. 111 at 12–13. The 4-South cells were "dirty" and Mr. Owens had "no running water [and] nothing to clean with for four days." *Id.* at 13 (Owens complaint), 19 (Owens aff.).[1]

Mr. Owens continued to receive daily medical assessments while in 4-South. Dkt. 96-1 at 7–8. On May 14, Mr. Owens was released from quarantine after meeting the criteria to leave isolation. *Id.* at 9.

Mr. Owens filed this case in August 2021, dkt. 1, and is proceeding on a Fourteenth Amendment conditions of confinement claim against Chief Williams and Warden Dickerson, and a Fourteenth Amendment denial of medical care claim against Dr. Propst. Dkt. 26 (amended complaint); dkt. 31 (screening order). Defendants moved for summary judgment. Dkt. 95.

## II.
## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp.*

---

[1] Dr. Propst testified that he never witnessed dirty conditions in the cells, and that the unit had running water. Dkt. 96-1 at 9.

3

*v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

### III.
### Analysis

The Fourteenth Amendment protects pretrial detainees' rights to receive reasonable medical care and not be subject to deplorable conditions of confinement.  *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (medical care); *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (conditions of confinement).  Both rights are "subject only to [an] objective reasonableness inquiry."  *Miranda*, 900 F.3d at 352; *Hardeman*, 933 F.3d at 823; *Kingsley v. Hendrickson*, 576 U.S. 389, 397–400 (2015).  The inquiry has two steps: first, whether "defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences" of their conduct, and second, "whether the challenged conduct was objectively reasonable." *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018); *see Gonzalez v. McHenry County*, 40 F.4th 824, 828 (7th Cir. 2022).  "[O]bjective reasonableness turns on the facts and circumstances of each particular case."  *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020) (quoting *Kingsley*, 576 U.S. at 397).

### A. Denial of medical care claim against Dr. Propst

Dr. Propst argues that his response to Mr. Owens's COVID-19 infection was objectively reasonable in the context of the jail's facing a developing public health emergency. Dkt. 97 at 17. Mr. Owens responds that Dr. Propst falsified his first positive COVID test and that Mr. Owens contracted COVID-19 from being placed in the 2-F quarantine dorm. Dkt. 113 at 8–9. He further argues that he was not provided masks, cleaning supplies, or medication and was continually re-infected with COVID-19 from being housed with other COVID-positive patients.[2] *Id.*

Whether Dr. Propst's medical care was objectively reasonable under "the totality of the facts and circumstances" requires a "broad[ ] look" at the evidence designated in the summary-judgment record. *McCann*, 909 F.3d at 885–7. In support of summary judgment, Mr. Owens has filed a verified response brief, dkt. 113, and designated his ten-page amended complaint, dkt. 26, an affidavit, dkt. 111 at 18–19, grievances, and portions of his medical records. *See* dkt. 111.

As to his medical care while quarantined, Mr. Owens states that he got pneumonia and strep throat, either while he was still in the 2-F dorm, dkt. 26 at 8–9, or after he was moved to 4-South, dkt. 113 at 11. When Dr. Propst came to 4-South, Mr. Owens "pleaded to [him] . . . for medical help but he said

---

[2] Mr. Owens also argues in his response that Defendants are not entitled to immunity under the Public Readiness and Emergency Preparedness (PREP) Act, dkt. 113 at 2, but Defendants did not raise PREP Act immunity in their motion for summary judgment.

5

I have to 'suck it up and wait it out.' [Dr. Propst] would not help me at all." Dkt. 26 at 8; *see* dkt. 113 at 9.³  Mr. Owens states that he received "[n]o medication" and "no kind of treatment for Covid or [pneumonia]" when he "notified all the Defendants a second time" about his conditions and symptoms. Dkt. 113 at 8–9; dkt. 111 at 19.  Mr. Owens also testified that, while at Marion County Jail, he "was never [given any] face masks" and there was no "social distancing."  Dkt. 113 at 8, dkt. 111 at 9.

However, Dr. Propst testified that he prescribed Mr. Owens cough syrup and antibiotics, though at times Mr. Owens refused treatment or medications. Dkt. 96-1 at 4–6, 9; *see* dkt. 96-7 (medication administration record including acetaminophen and antibiotics).  And in response to that, Mr. Owens acknowledges that he received at least some treatment, stating that the evidence "clearly shows that he never refused any treatment to covid-19" but instead "stop[ped] treatment . . . because he was feeling fine."  Dkt. 113 at 16. In fact, Mr. Owens cites his medical "orders" at dkt. 96-6, saying that they "clearly show[ ] that from April 4, 2020 until July 29, 2020 Plaintiff completed all his treatments [given] by medical staff" and that the "only treatment for covid-19 was the taking of plaintiff's temperature, blood pressure reading and vitals."  Dkt. 113 at 16.  Mr. Owens adds "that his medications were taken as needed, inconsist[ent] with Defendants' evidence."  Dkt. 113 at 17.

The upshot of this evidence is that Mr. Owens does not dispute that he received many temperature, pulse, blood pressure, and oxygen level checks—

---

³ Dr. Propst denies making this statement.  Dkt. 96-1 at 10.

6

sometimes more than once per day—as Dr. Propst testified and as reflected in Mr. Owens's medical records. Dkt. 96-6; *see* dkt. 96-1 at 4–5. Mr. Owens also does not appear to dispute that Dr. Propst ordered and reviewed the results of an x-ray and EKG. Dkt. 96-1 at 5, 8. And Mr. Owens contradicted his own testimony that he received no medication and no treatment by testifying that "his medications were taken as needed" and that he was compliant with the care he received and stopped treatment once he was feeling better.

Mr. Owens also does not appear to dispute the evidence of specific care that Dr. Propst provided during Mr. Owens's COVID-19 infection. On April 6, Mr. Owens reported sharp chest pain, so Dr. Propst checked Mr. Owens's blood oxygen levels and conducted a lung exam, finding that Mr. Owens's lungs were clear. *Id.* at 4–5. A few days later, Mr. Owens reported chest pain and decrease in smell. *Id.* at 5. He received another lung check shortly after that, which revealed "coarseness" in one lung, so Dr. Propst ordered an x-ray. *Id.* at 5–6. Mr. Owens reported shortness of breath at the end of April, though he "did not appear in distress upon examination." *Id.* at 7. Mr. Owens continued to report shortness of breath, and Dr. Propst ordered an EKG, which showed normal results requiring no further treatment. *Id.* at 8.

This undisputed evidence and Mr. Owens's testimony about the medical care he received shows that Dr. Propst's treatment "was not obviously ineffective" but represented care provided "in a manner calculated to treat him." *Duckworth v. Ahmad*, 532 F.3d 675, 682 (7th Cir. 2008) (affirming summary judgment on an Eighth Amendment deliberate indifference claim);

7

*accord Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (Under the Eighth Amendment, "[t]he federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment.").

As for Mr. Owens's allegation that Dr. Propst faked Mr. Owens's COVID test result, so that Mr. Owens did not contract COVID until he was quarantined in 2-F, Dr. Propst testified that he did not do so. Dkt. 96-1 at 10. Mr. Owens identifies no basis for personal knowledge to support his speculation about a faked COVID test, so he cannot raise a dispute about this fact issue. *See Simpson v. Franciscan All.*, 827 F.3d 656, 662 (7th Cir. 2016) (testimony containing "only vague, conclusory assertions about incidents outside [plaintiff's] personal knowledge" not sufficient to survive summary judgment). Similarly, Mr. Owens has not disputed that the jail's quarantine protocols were established under the CDC's recommended "cohorting" practice, and that Dr. Propst based Mr. Owens's placements on his medical judgment. Dkt. 96-1 at 6–8. Finally, even accepting that Dr. Propst once dismissed Mr. Owens's request for help in 4-South, no designated evidence suggests that Mr. Owens told Dr. Propst at that time that he was suffering severe symptoms requiring immediate care. *See* dkt. 26 at 8; dkt. 96-1; *Igasaki v. Ill. Dep't of Fin. & Prof. Reg.*, 988 F.3d 948, 956 (7th Cir. 2021) (speculation or conclusory allegations alone are insufficient to survive summary judgment).

Under this "totality of the facts and circumstances," no reasonable jury could find that Dr. Propst provided objectively unreasonable medical care. *McCann*, 909 F.3d at 887 (nurse did not act in an objectively unreasonable way when she "attended diligently and conscientiously" to patient's medical needs). Instead, the undisputed evidence is that Dr. Propst and jail officials followed CDC recommendations as best they could in providing medical care in the early days of a global health emergency. *See Mays*, 974 F.3d at 823 (noting that while CDC guidelines on COVID-19 "do not themselves set a constitutional standard" they "are certainly relevant to an objective reasonableness determination"). Dr. Propst is therefore entitled to summary judgment on Mr. Owens's medical claim. *See McCann*, 909 F.3d at 886; *Mays*, 974 F.3d at 815–21, 823.

### B. Conditions of confinement claim against Warden Dickerson and Chief Williams

Mr. Owens argues that Warden Dickerson and Chief Williams subjected him to objectively unreasonable conditions of confinement when they assigned him to a "nasty dirty lock up cell" in 4-South with "no running water" and no social distancing, and nothing to clean with for four days. Dkt. 113 at 8. Defendants respond that the designated evidence does not support Mr. Owens's description and that instead the cell was not dirty, that cleaning products were available, and that the unit had running water. Dkt. 97 at 20.

Here, the only designated evidence supporting Mr. Owens's conditions-of-confinement allegations are his general assertions. *See* dkt. 111 at 19; dkt. 113 at 8. He does not explain what he means by "dirty" and, despite his vague

9

allegation of no running water, designates no evidence that he lacked drinking water or the ability to wash himself.  *Cf. Smith v. Dart*, 803 F.3d 304, 315 (7th Cir. 2015) ("It is the jail's constitutional obligation to provide . . . drinking water.").  He also designates no evidence that he spoke to Chief Williams or Warden Dickerson about the conditions in his cell, made them or anyone else aware of any issues with the water, or requested cleaning supplies.  And the grievances Mr. Owens submitted as evidence did not put them on notice of his cell-condition allegations because he raised concerns about being exposed to COVID-19 and quarantine policies generally, without mentioning water, cleaning supplies, or dirty cells.  Dkt. 111 at 2–8.[4]

Taken in the light most favorable to Mr. Owens, his bare-bones evidentiary designations about his cell conditions do not allow a reasonable jury to conclude that Chief Williams or Warden Dickerson knew about the conditions Mr. Owens alleges he experienced in his cell.  *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation"); *Allen v. Hasemeyer*, 673 Fed. App'x 575, 578 (7th Cir. 2017) ("Allen vaguely asked Whitthoft to remove him from a 'condemned' cell, but Allen did not explain what conditions led him to call it 'condemned.'").

---

[4] Some of these grievances do appear to raise general concerns about social distancing policies in the jail.  But the designated evidence shows that jail officials tried to implement social distancing policies when feasible.  *See* dkt. 96-1; *Mays*, 974 F.3d at 815–21 (discussing possible feasibility limitations on social distancing jail policies in reversing a preliminary injunction grant).

10

But even if Chief Williams or Warden Dickerson had been personally involved, no reasonable jury could find that they acted "purposefully, knowingly" or "recklessly" with respect to the situation, or that they acted in an objectively unreasonable manner.  *See Hardeman*, 933 F.3d at 824–24 (three-day water shutoff which resulted in accumulated waste in toilets and attracted insects, and where detainees lacked sufficient water to drink, was objectively unreasonable); *cf. Gray v. Hardy* 826 F.3d 1000, 1005–06 (7th Cir. 2016) (only instances when "prisoners are deprived of cleaning supplies and running water . . . in extreme circumstances" are considered constitutional violations under the objective prong of the Eighth Amendment).  Indeed, Mr. Owens does not contest that the medical evidence includes no indication that he suffered dehydration or any health issues that could have been caused by an unclean environment.  *See* dkt. 97 at 20; *Gray*, 826 F.3d at 1006 (Gray "must also show that he suffered some cognizable harm from the overall lack of a sanitary environment, and that the warden's deliberate indifference caused that harm"); *Mays v. Emanuele*, 853 F. App'x 25, 27 (7th Cir. 2021) (noting that plaintiff "needed to furnish evidence that the conditions in his cell posed an objectively serious threat to his health" and that officers had to have acted purposefully, knowingly, or recklessly and responded in an objectively unreasonable way for claim to succeed).

"It is well established that in order to withstand summary judgment, the non-movant must allege *specific* facts creating a genuine issue for trial and may not rely on vague, conclusory allegations."  *Gabrielle M. v. Park Forest–Chi.*

11

*Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003). Mr. Owens has not done so for his conditions of confinement claim. Chief Williams and Warden Dickerson are therefore entitled to summary judgment on Mr. Owens's conditions-of-confinement claim.

## IV.
## Conclusion

For the above reasons, Defendants' motion for summary judgment is **GRANTED**. Dkt. [95].

Final judgment will issue in a separate entry.

**SO ORDERED.**

Date: 3/26/2025

                                James Patrick Hanlon
                                United States District Judge
                                Southern District of Indiana

Distribution:

MICHAEL T. OWENS
104328
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All electronically registered counsel